230 So.2d 395 (1969)
Charles E. METRAILER
v.
F & G MERCHANDISING, INC.
No. 7825.
Court of Appeal of Louisiana, First Circuit.
December 22, 1969.
Rehearing Denied February 2, 1970.
Peter T. Dazzio, of Watson, Blanche, Wilson, Posner & Thibaut, Baton Rouge, for appellant.
John Dale Powers, of Sanders, Miller, Downing & Kean, Baton Rouge, for appellee.
Before LANDRY, SARTAIN and ELLIS, JJ.
LANDRY, Judge.
Plaintiff appeals the judgment of the lower court absolving defendant, F & G Merchandising, Inc., otherwise known as Globe Discount Center (Globe), from liability for damages to plaintiff's automobile resulting from a brake failure attributed to defendant's alleged negligent repair of the vehicle's right front brake. We find the trial court erred in rejecting appellant's demand for stipulated damages in the sum of $1,307.66.
The accident occurred at approximately 6:15 P.M., July 30, 1966, when plaintiff's *396 vehicle was being operated by his son, George. Young Metrailer, accompanied by acquaintances Stephanie Elkins, Marty Huguest and Kathleen Cotter, was driving plaintiff's 1964 Dodge Station Wagon along Lobdell Avenue in the City of Baton Rouge, approaching that street's dead end intersection with superior Jefferson Highway, traveling at a speed of approximately 35 miles per hour. In attempting to stop in obedience to a stop sign, Metrailer applied his brakes which failed to work. The Metrailer car proceeded into the intersection, struck a vehicle traveling along Jefferson Highway, jumped a ditch and came to rest in a field.
The Metrailer youth testified he applied his brakes forcibly but they failed to respond. He also stated he had been driving the vehicle only some 15 to 20 minutes prior to the mishap. He further stated he attempted to brake the vehicle by shifting the transmission into "park" but to no avail.
In essence the passengers in the Metrailer vehicle corroborated their host's account of the events attending the accident.
The accident was investigated shortly after its occurrence by A. J. Davis of the City Police Department. Officer Davis testified he found no skid marks left by plaintiff's vehicle. He tested the brakes of the vehicle at the scene without starting its engine and found that the brake pedal went completely to the floor. He then started the motor, applied the brakes and again found they did not work. Still later, he attempted to demonstrate to plaintiff who arrived on the scene that the brakes would not work but found the engine would not start because the battery had run down.
It is conceded that on June 13, 1966, Globe ground the brake drums on plaintiff's car, reshaped its front brake shoes and installed new brake shoes on its rear wheels at a cost of $19.71. On June 18, 1966, Globe installed new brake shoes on both front wheels of plaintiff's automobile. It is also admitted the vehicle had been driven approximately 2300 miles in the approximately 6 weeks interval, June 18 and July 30, 1966.
Plaintiff testified that his liability insurer, State Farm Insurance Company, engaged Mr. Alvin Doyle to inspect the vehicle for brake failure following the accident. Metrailer assisted Doyle in such an inspection conducted August 3, 1966. He stated that at this time there was no brake pedal on the car as evidenced by a picture of record showing the brake pedal fully depressed. On conducting this test, however, the engine of the car was not started because the battery was dead. Subsequently, the vehicle was towed to a dealer's parking lot and still later to Margot's Brake Service. According to Metrailer, the brakes were taken apart for the first time at Margot's on or about August 13, 1966, in his presence and that of Mr. Margot, Jack White, a Margot mechanic, and another Margot employee whose identity is unknown. On removing the right front wheel it was found that the "sleeve" constituting part of the brake adjuster was lying out of place on the inside of the brake backing plate. The brake drums were replaced without disturbing the braking system. One or two days later plaintiff returned and took photographs of the right front brake. Subsequently the brake drum was again removed and the condition of the right front brake observed by William Lemings, Alvin Doyle, Louis F. Margot, Jack White and plaintiff. According to plaintiff the fluid level in the hydraulic brake system was checked and found to be normal. He also stated he had no work done on the brakes after June 18, 1966, until Margot did some repair work following the accident. He stated further that the work done by Margot did not concern the hydraulic system.
Mr. William Lemings, a recognized brake expert, testified he was present when the right front wheel was removed on or about August 13, 1966. He noted that the "extension" or "sleeve" of the adjuster *397 mechanism was not affixed to the adjuster "spool" or spindle, but was out of place lying on the bottom of the brake backing plate. Lemings also noted that the brake adjuster spool was not lodged against the webbing of the brake shoe, as it should have been but rather had slipped to one side. In Lemings' opinion this condition would make the brakes inoperative. Lemings explained that power brakes (with which plaintiff's car was equipped) are basically mechanical but are hydraulically activated. He noted that such a system employs fluid to create and push pressures from a master cylinder situated under the hood of an automobile by means of lines or conduits to individual hydraulic cylinders forming a part of each wheel's braking system. The pressure thus created and exerted goes to the wheel of least resistance. It results in an outward movement of the brake shoes placing the shoes in contact with the brake drums creating friction causing an automobile to stop. Lemings explained further that whenever the clearance between any particular set of brake shoes and brake drum is excessive, all hydraulic pressure in the system will flow to that wheel. As a result the brake pedal will depress to the floor with no braking effect at all. In Lemings' opinion, failure to install the extension or sleeve on the adjusting device would cause such excessive clearance and resultant brake failure. Lemings also stated that if the sleeve or extension is properly installed, it is impossible for it to become dislodged from its proper position. According to Lemings, hydraulic brakes may be tested even though the engine of an automobile is not running. He was also of the view that repeated pumping of brakes might compensate to some extent for the absence of an adjuster sleeve. Lemings testified he checked the hydraulic fluid level in plaintiff's car and found it adequate. Mr. Lemings conceded an internal bypass in the master cylinder, although an extremely rare occurrence, is a possible cause of brake failure. He acknowledged that because of the manner in which brakes are constructed, brakes can automatically adjust themselves when a vehicle is backed up even though the adjuster sleeve is not in position.
Louis F. Margot, a recognized brake specialist with many years experience, was present at the inspection testified to by Lemings. He confirmed Lemings' testimony that a properly installed adjuster sleeve would under no circumstances come loose. Margot also stated that the absence of an adjuster sleeve would in every situation except the one hereinafter shown, cause brake failure. He explained that failure to install the sleeve would not cause brake failure if the brake adjuster shaft or spindle was screwed out sufficiently so that the end of the spindle fit flush with the opposite brake shoe webbing normally contacted by the sleeve itself. Margot also testified he set up a test which confirmed this theory. He stated he arranged a brake on a car with the spindle or shaft of the adjuster flush against the brake shoe and that in each brake application the brakes worked normally. He then duplicated the condition found in plaintiff's brakes by installing the adjuster so that the spindle lay on the side of the brake shoe webbing instead of pressing flush against the lip of the webbing. In this position he found the brakes failed repeatedly. Mr. Margot conceded brake failure might result from the phenomenon of internal master cylinder bypass.
Jack White, expert mechanic, was also present when the right front wheel was first removed from plaintiff's vehicle. He noted the adjuster sleeve was detached from the adjuster assembly. He was firmly of the opinion this condition caused the brakes on the car to fail. White conceded, that in the sense anything was possible, it was possible the failure occurred due to internal hydraulic bypass in the master cylinder. However, he considered it highly improbable the failure in question resulted from hydraulic internal bypass. White explained the function of the adjuster sleeve is to keep the brake shoes in line. He *398 noted the adjuster sleeve is slotted on one end to receive the lip of the webbing of the brake shoe thus insuring proper position and alignment. White also stated that once the sleeve is properly attached proper alignment is permanently insured.
David Rabalais, expert brake mechanic, testified he performed for Globe the brake work done on plaintiff's automobile on June 13 and 18, 1966. He stated that if the adjuster sleeve is left off the brakes would still operate properly provided the adjuster spindle is elongated by screwing it out so that the spindle end, a flat, unslotted surface, contacts and pushes against the lip of the brake shoe webbing. Rabalais also stated that once the spindle is thus extended it will hold in place and not slip. Rabalais conceded the function of the adjuster extension is to anchor the adjuster assembly to one of the brake shoes. He also noted that in the absence of the adjuster extension, the only thing that holds the flat end of the adjuster spindle to the lip of the brake shoe webbing is spring tension which operates in one plane only.
Al Bercegeay, brake expert and employee of Globe, testified he tested the brake pedal on plaintiff's car at his employer's request a few days following the accident. He found some brake pedal in that the brake depressed to within two inches of the car floor and not to the car floor itself. However, it is conceded by all the other experts that the brake pedal has an iron bar extension which prevents the pedal from being depressed any closer to the floor board than two inches. In his opinion, with the adjuster extension off, an automobile would still have brakes if the end of the adjuster spindle was adjusted to contact the lip of the brake shoe webbing. He also contended there would be brakes on a car even if the spindle end did not contact the lip of the brake shoe webbing. He acknowledged, however, that leaving off the adjuster sleeve was improper workmanship.
Lloyd J. Viator, brake expert called on behalf of defendant, testified that screwing out the adjuster spindle to meet the lip of the brake shoe webbing would compensate for the absence of the adjuster sleeve and a brake thus assembled would work properly. He conceded, however, that to leave off the adjuster sleeve "is rank poor workmanship".
Alvin Doyle testified he examined subject vehicle on August 3, 1966 and found the proper amount of fluid in the hydraulic brake system. On August 5, 1966, he tested the vehicle's brakes by driving it backward and forward in a driveway at a speed of 5 to 10 miles per hour, braking the car to a stop approximately 18 times. He was present when the right front wheel was removed. He noted the adjuster sleeve was detached. He likewise observed the adjuster spindle had been elongated ½ inch to compensate for the absence of the sleeve. Mr. Doyle theorized the adjustment was probably made after complete assembly of the brake system at which time it would be difficult to detect that the adjuster sleeve was not attached. Also, Doyle conceded the missing sleeve denoted poor workmanship. In addition Doyle testified he demonstrated at Margot's establishment in the presence of a Mr. Milstead, that he could lock the wheels of plaintiff's automobile with two extra applications of the brakes notwithstanding the spindle end of the brake adjuster system was lying alongside the brake shoe instead of being flush with the lip of the brake shoe webbing. We note therein a degree of conflict with Doyle's testimony that when he previously tested plaintiff's car in a driveway, the brakes worked properly, his testimony then inferring only a single application of brakes. Doyle also explained a master cylinder bypass resulting from internal leakage in the master cylinder induced by engine heat was a distinct possible cause of the brake failure in this instance. Doyle admitted he checked for evidence of hydraulic brake failure and found none. In essence, it was *399 Doyle's opinion the failure in question did not result from the mechanical condition of the right front brake. Mr. Doyle also conceded the adjuster sleeve could not become detached if once correctly installed.
The experts agree that the adjuster sleeve could have been trapped in the brake shoe webbing in such manner that it would not rattle during the interval it remained out of place. On this basis they concluded it was entirely possible that no person driving the automobile would be aware of the true condition of the right front brake.
The trial court found that plaintiff did not prove the cause of the brake failure and that the failure could have resulted from an internal master cylinder bypass, a phenomenon unrelated to the brake work done by defendant. The trial court also found that notwithstanding the uninstalled adjuster sleeve, the adjuster spindle, elongated to press against the lip of the brake shoe webbing, served the same purpose as the sleeve. Additionally, the trial court placed great weight on its conclusion that the sleeve could have disengaged at any time and once off would make sufficient noise to alert the driver of the vehicle.
We are aware of the well established rule that the findings of fact by a trial court are entitled to great weight and should not be disturbed on appeal. Rudolph Ramelli, Inc. v. City of New Orleans, 233 La. 291, 96 So.2d 572. We find that in this instance the lower court erred in reaching the conclusions shown.
In view of the evidence adduced, we find there was a brake failure. It was so testified by the driver of plaintiff's car, the guest passengers present, and the investigating officer who tested the brakes at the scene of the accident. We likewise find the adjuster sleeve or extension was left off the adjuster assembly when defendant repaired plaintiff's brakes. This conclusion is inescapable because (1) defendant is the only one who did any work on the brakes preceding the accident, and (2) if the sleeve had been replaced when the work was done, it could not have become detached.
We find defendant guilty of negligence in the respect shown. The degree of care owed increases in relation to the danger inherent in a given situation. Culpepper v. Leonard Truck Lines, Inc., 208 La. 1084, 24 So.2d 148. The danger incident to workmanship which results in rendering a motor vehicle's brakes unsafe is both readily apparent and obviously great.
It remains whether defendant's negligent conduct was a cause in fact of the accident. A cause in fact is one without which the accident would not have occurred. Arnold v. Griffith, La.App., 192 So. 761.
Plaintiff must prove his case by a clear preponderance of evidence. In effect this means plaintiff need only show it is more probable than not that defendant's negligent conduct was the cause of the harm, damage or injury inflicted. Perkins v. Texas and New Orleans Railroad Company, 243 La. 829, 147 So.2d 646.
Causation may be established by circumstantial evidence which need not necessarily exclude all other possible causes. Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395.
Mere proof that something is possible is of little probative value regarding decision of a question of fact, unless all other alternatives are shown to be impossible. Bogasky v. Falsetta, La.App., 189 So.2d 98.
We eliminate internal hydraulic bypass as a possible cause of the accident in question. No malfunctioning was found in the hydraulic system which was observed to be full of fluid following the accident. Doyle's testimony is that such a rare phenomenon is most likely to be caused by engine heat. It appears the vehicle in question had been run only some 20 minutes before the accident occurred. Moreover, *400 when the brakes were subsequently tested at the scene and found inoperative, the motor had not been run for some time. It seems doubtful the engine could have remained sufficiently hot to cause a repeat of the phenomenon mentioned. Moreover, it was shown that plaintiff had Margot repair the brakes subsequent to the accident. It was also shown Margot performed no repairs on the hydraulic system. We conclude that the possibility of internal hydraulic bypass in this instance is so remote, conjectural and speculative as to be disregarded as a possible cause in fact of the brake failure which occurred.
We also find the evidence preponderates overwhelmingly in favor of the conclusion that the accident resulted from the improper reinstallation of the adjuster assembly. It has been shown that the slotted sleeve was left off when the brake was reassembled. When the wheel was removed following the accident, it was discovered that the blunt end of the adjuster spindle lay alongside the brake shoe webbing, which was not its proper position. Mr. Margot's tests of a brake similarly assembled disclosed the brake would not function. We also note Doyle's testimony that when he tested the brakes on plaintiff's car in Milstead's presence, Doyle found they worked on third application. We conclude the mechanic who assembled the brake left off the sleeve and then compensated therefor by extending the adjuster spindle outward some ½ inch so that its blunt end fitted against the lip of the brake shoe webbing. Undoubtedly the device remained in this position producing an operable brake until, because of some jolting or bumping of the vehicle, contact was lost between the spindle end and the lip of the brake shoe webbing causing the failure which resulted in the accident. That this occurrence happened some six weeks and 2300 miles following the repair is a matter of no concern. We find the duty of defendant to properly repair the brakes extended to the time and circumstances involved in the case at hand and was therefore the sole proximate cause of this accident.
The judgment of the trial court is reversed and judgment rendered herein in favor of plaintiff Charles E. Metrailer and against defendant F & G Merchandising, Inc. in the sum of $1,307.66, with legal interest thereon from date of judicial demand, until paid, and all costs of these proceedings.
Reversed and rendered.